## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____


JOHN A. MAHER, individually and
on behalf of all others similarly situated,

            Plaintiff,

v.

TIMOTHY M. MARQUEZ, JOEL L. REED, DONNA L. LUCAS, J.C. MCFARLAND,
MYLES W. SCOGGINS, MARC A. SNELL, RICHARD S. WALKER, VENOCO, INC.,
DENVER PARENT CORPORATION, and DENVER MERGER SUB CORPORATION,

            Defendants.

---

## CLASS ACTION COMPLAINT
---

Plaintiff John A. Maher ("Plaintiff"), by his attorneys, alleges upon information and

belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE OF THE CASE

1.      Plaintiff brings this class action on behalf of the public stockholders of Venoco,

Inc. ("Venoco" or the "Company") against Venoco's Board of Directors for their breaches of

fiduciary duties arising out of their attempt to sell the Company by means of an unfair process

and for an unfair price to the Company's Chairman of the Board and Chief Executive Officer,

Timothy M. Marquez ("Marquez") through a wholly owned entity, Denver Parent Corporation

("Denver Corporation").

2.      Venoco is an independent energy company primarily engaged in the acquisition,

exploration, exploitation, and development of oil and natural gas properties. Venoco's principal

producing properties are located both onshore and offshore Southern California and onshore in California's Sacramento Basin, and are characterized by long reserve lives, predictable production profiles and substantial opportunities for further exploitation and development.

3.      Marquez is the Company's majority, controlling stockholder, owning approximately 50.3% of the Company's outstanding common stock. On August 29, 2011, Venoco announced that it received a proposal from Marquez pursuant to which Marquez has proposed to acquire all of the remaining outstanding shares of Venoco that he does not already own for $12.50 per share in cash. However, the $12.50 per share represents wholly inadequate consideration in light of the Company's intrinsic value and future prospects. Indeed, numerous analysts had price targets for Venoco common stock well above the $12.50 offer price, with one analyst at Global Hunter Securities calling Marquez's offer the "Takeunder of the Decade."

4.      Plaintiff, therefore, brings this action on behalf of Venoco stockholders, alleging that Venoco's board of directors (the "Board" or the "Individual Defendants") have breached, and are continuing to breach, their fiduciary duties to the Company's shareholders.

5.      Accordingly, to prevent the Company's shareholders from suffering irreparable harm from the consummation of an unfair and inadequate takeover, Plaintiff seeks to enjoin, preliminarily and permanently, the proposed Buyout of Venoco.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Texas, none of the Defendants are citizens of Texas, and the matter in controversy exceeds the sum or value of $75,000.

7.      Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District. In addition, Venoco maintains its principal executive offices in Denver, Colorado.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Venoco.

9.      Venoco is a corporation organized and existing under the laws of the State of Delaware and maintains its executive offices at 370 17th Street, Suite 3900, Denver, Colorado 80202. Venoco is an independent energy company primarily engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties primarily in California. Venoco operates three offshore platforms in the Santa Barbara Channel, has non-operated interests in three other platforms, operates three onshore properties in Southern California, and has extensive operations in Northern California's Sacramento Basin.

10.      Defendant Marquez has served as the Company's Chairman of the Board and CEO since 2004. Marquez co-founded Venoco in September 1992 and served as CEO and as a director from formation until June 2002. He founded Marquez Energy, a privately held exploration and production company, in 2002, and served as its CEO until the Company acquired it in March 2005. Mr. Marquez returned as Chairman, CEO and President in June 2004. Previsouly, Marquez served at Unocal Corporation, where he worked for 13 years managing assets offshore in California and in the North Sea and performing other managerial and engineering functions. He has a B.S. in petroleum engineering from the Colorado School of

Mines. Marquez owns 50.3%, of Venoco's outstanding common stock. As such, Marquez is the Company's majority, controlling stockholder.

11.     Defendant Joel L. Reed ("Reed") has served as a director of the Company since August 2005. He is currently a member of the Audit Committee and is the Chairman of the Corporate Governance and Nominating Committee. Previously, Reed served as a director of Venoco from September 1998 to March 2002. Reed was also a partner of a predecessor entity (and later, a co-founder) of Relational Group, an investment banking firm that included Relational Investors and Relational Advisors. Relational Advisors separated from Relational Group in 2005 and became RA Capital Advisors, a member of RA Capital Group. Reed has served as RA Capital Group's lead principal. In addition, he is a founder of two private equity firms, Titan Investment Partners and HRA Real Estate Management I LLC. From 1984 to 1994, Reed served at Wagner & Brown Ltd. of Midland, Texas, where he was the CFO and later President and CEO. From 1981 to 1984, Reed was a member of the founding group of Ensource, Inc., as well as its controller and CFO.

12.     Defendant Donna L. Lucas ("Lucas") has served as a director of the Company since February 2009. She is currently a member of the Corporate Governance and Nominating Committee. She is also the founder, CEO, and President of Lucas Public Affairs. Prior to founding Lucas Public Affairs in April 2006, Lucas served as Deputy Chief of Staff for Strategic Planning and Initiatives for California Governor Arnold Schwarzenegger from 2003 to 2006 and as Chief of Staff to California First Lady Maria Shriver from 2004 to 2006. She was also the Global Public Affairs Practice Leader for Porter Novelli, an international public relations firm, from 2000 to 2003, after it acquired Nelson Communications Group, where she served as

President and CEO from 1998 to 2003. In addition, Lucas has previously served as Deputy Press

Secretary for California Governor George Deukmejian, Deputy Treasurer for California

Treasurer Tom Hayes, and as California Press Secretary for President George H.W. Bush.

13.     Defendant J.C. McFarland ("McFarland") has served as a director of the

Company since June 2004. He is currently a member of the Compensation Committee and the

Chairman of the Audit Committee. He also serves as a consultant with McFarland Advisors, Inc.

Prior to that, he served as the CEO of McFarland Energy, Inc. from 1991 until its sale in 1997.

He has also served on the boards of Huntway Refining from 1998 to 2001, privately held

Gotland Oil, Inc. from 2000 to 2001, and as of May 2010, he serves on the board of NASDAQ-

listed Searchlight Minerals Corporation. In addition, McFarland was President of the California

Independent Petroleum Association from 1996 to 1998.

14.     Defendant Myles W. Scoggins ("Scoggins") has served as a director of the

Company since June 2007. He is currently a member of the Corporate Governance and

Nominating Committee. He has also served as President of Colorado School of Mines since June

2006. In addition, Scoggins served as Executive Vice President of Exxon Mobil Production Co.

from 1999 to 2004. Prior to the merger of Mobil and Exxon in 1999, he was President,

International Exploration & Production and Global Exploration and a member of the executive

committee of Mobil Oil Corporation. Scoggins is also a member of the Board of Directors of

QEP Resources, Inc. and Cobalt International Energy and is a member of the National Advisory

Council of the U.S. Department of Energy's National Renewable Energy Laboratory. He also

served on the Board of Directors of Questar Corporation from 2005 until 2010 and of Trico

Marine Services, Inc. from 2005 until 2011.

15.     Defendant Marc A. Snell ("Snell") has served as a director of the Company since December 2006. He is currently the Chairman of the Compensation Committee. He has also served as the CFO of Sempra Energy since 2006. Previously, he served as Group President of Sempra Global. Prior to that, he served as Vice President of Planning and Development of Sempra Energy. In addition, in the past five years, Snell has served as a director of San Diego Gas and Electric Company, Southern California Gas Company, and Pacific Enterprises, all of which are subsidiaries of Sempra Energy. Before joining Sempra Energy in 2001, he served as CFO of Earth Tech, a water management, engineering and environmental services firm, CFO of Dames and Moore, an international engineering firm, Chief Financial and Administrative Officer for Latham & Watkins, a worldwide law firm, and a Senior Manager at KPMG Peat Marwick.

16.     Defendant Richard S. Walker ("Walker") has served as a director of the Company since June 2007. He is currently a member of the Audit and Compensation Committees. He is also the Executive Vice President and Managing Director of the Houston office of DHR International, a leading retained executive search firm. Previously, Walker served as a Managing Director of JPMorgan, where he directed investment banking relationships with a variety of energy clients. Walker worked with JPMorgan and its predecessors from 1994 to 2005, prior to which he worked with NationsBank (the predecessor of Bank of America) from 1990 through early 1994. In addition, from 1981 through early 1990, Walker worked for Texas Commerce Bank (also a predecessor to JPMorgan).

17.     Defendants referenced in ¶¶ 10 through 16 are collectively referred to as Individual Defendants and/or the Venoco Board. The Individual Defendants as officers and/or

directors of Venoco, have a fiduciary relationship with Plaintiff and other public shareholders of Venoco and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Venoco common stock and their successors in interest, except Defendants and their affiliates (the "Class").

19.     The Class is so numerous that joinder of all members is impracticable. As of September 15, 2011, Venoco has approximately 61.62 million shares outstanding.

20.     Questions of law and fact are common to the Class, including, *inter alia*:

(a)     Have the Individual Defendants, including Marquez, breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

(b)     Are the Individual Defendants, including Marquez, in connection with the Buyout pursuing a course of conduct that is in violation of their fiduciary duties;

(c)     Whether the Individual Defendants, including Marquez, are engaging in self-dealing in connection with the Buyout;

(d)     Whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Venoco;

(e)     Has Venoco aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(f)     Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

21.     Plaintiff's claims are typical of those of the other members of the Class.

22.     Plaintiff is committed to prosecuting this action, has no interests that are adverse to the Class, and has retained competent counsel experienced in litigation of this nature.

23.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants. Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Furthermore, Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Venoco's Strong Performance and Positioning for Growth**

24.     Venoco is an independent energy company primarily engaged in the acquisition, exploration, exploitation and development of oil and natural gas properties primarily in California. Venoco operates three offshore platforms in the Santa Barbara Channel, has non-operated interests in three other platforms, operates three onshore properties in Southern California, and has extensive operations in Northern California's Sacramento Basin. The Company is also pursuing a major exploration and development project targeting the onshore Monterey shale formation in Southern California. Marquez co-founded the Company in 1992.

25.     On May 5, 2011, the Company reported its financial results for the first quarter of 2011. Among the highlights, the Company reported: lease operating expenses of $13.52 per barrels of oil equivalent ("BOE"); production from legacy oil & gas assets up almost 500 BOE/d

from fourth quarter 2010; and daily production of 17,815 BOE for the first quarter. The company also announced the discovery of approximately 134 MMBO resource potential in two of the company's four Monterey areas, and that their revolving credit facility was increased and extended.

26.     "Our production base from legacy Southern California and Sacramento Basin assets has started the year well," said defendant Marquez in the press release announcing the financial results. "In the Sacramento Basin we've had success drilling two of three seismic anomalies, which we expect will be a positive contribution to 2011 production volumes. This month we also kicked off wellwork and drilling at Platform Gail and we are preparing to spud our first of several wells at West Montalvo."

27.     On August 2, 2011, the Company announced its financial results for the second quarter of 2011. As stated in the press release, among the highlights, the Company reported:

> · Net Income $19 Million; Adjusted Earnings $15 Million
> · Adjusted EBITDA $58 Million, up 14% from 1Q
> · Lease operating expenses $13.14 per BOE, down 3% from 1Q
> · First of four 2011 delineation wells drilled in Sevier discovery
> · Large resource potential identified in Sacramento Basin

28.     In the same press release, defendant Marquez commented on Venoco's strong quarter and exciting prospects, noting the Company's excellent liquidity, significant inventory of upcoming projects, and the enormous potential of the Monterey shale:

> After minimal activity in the first quarter in our oily Southern California legacy properties, we became quite active by the end of the second quarter and expect higher activity levels for the remainder of the year. It's an exciting time for the company; oil prices are strong (with California prices exceeding WTI), we have excellent liquidity, and a significant inventory of proven oil projects to pursue. The potential of our legacy Southern California assets has been somewhat overshadowed by the enormous

> potential we see with the onshore Monterey shale, but we're
> equally as excited about these properties and expect to pursue a
> number of development projects during the second half of this year
> and in 2012.

29.     The Company also reported on its 2012 outlook expecting, among other things, a

year of increased drilling activity, strong cash flow, greatly improved debt metrics:

> The company's average oil realizations in 2012 are expected to
> improve as a result of the March 31, 2012 expiration of certain
> crude oil sales contracts tied to NYMEX West Texas Intermediate
> (WTI) pricing. Approximately half of the company's crude oil is
> sold under those contracts, while the balance is sold on contracts
> tied to California posted prices, which have exceeded WTI by up
> to $13 per barrel during 2011. The company's average 2010
> realized oil prices were approximately $10 per barrel less than
> WTI; however, with the recent higher California postings its
> average oil price realizations in the first half of 2011 have
> improved to approximately $6 less than WTI. As the company's
> WTI based contracts expire in 2012 and based on current forward
> strip pricing, the company believes its average realized oil prices in
> 2012 will exceed WTI by approximately $7 per barrel.

> Venoco continues to monitor progress at the Hastings field where
> it has a reversionary interest in the large $CO_2$ flood being
> implemented by Denbury Resources. The company believes its
> share of reserves associated with the flood could eventually be up
> to 40 million BOE. As expected, the field is currently shut-in to
> build pressure from the $CO_2$ flood and is expected to return to
> production late in 2011. Depending on the timing and level of
> response from the $CO_2$ flood, the company believes a portion of its
> 15.2 million BOE of engineered probable reserves may be
> reclassified as proven reserves by year-end 2011.

> When the Hastings field reaches payout for Denbury, Venoco will
> earn, at no cost, a 22.3% working interest in this large producing
> oil field. Venoco currently estimates that the $CO_2$ flood will reach
> payout in approximately 24 months using $100 per barrel oil
> pricing. The company also estimates that a sustained decrease in
> oil pricing of $10 per barrel would extend payout by approximately
> 4 months. The company currently expects to explore marketing its
> interest in the field in 2012 after response to the $CO_2$ flood has
> been demonstrated.

> "With higher world-wide oil prices and strong California pricing, we expect 2012 can be both a year of increased drilling activity and, with strong cash flow and the potential sale of Hastings, greatly improved debt metrics," said Mr. Marquez. "We have a tremendous amount of value we are focused on unlocking."

**Marquez Seeks to Purchase the Company at an Unfair Price**

30.     On August 29, 2011, Venoco announced that it had received a proposal letter from Marquez pursuant to which Marquez has offered to acquire all of the outstanding shares of common stock of Venoco not currently owned by him in a going private transaction for $12.50 per share in cash. As stated in the press release:

> DENVER, COLORADO, August 29, 2011 /Marketwire/ — Venoco, Inc. (NYSE: VQ) announced that its board of directors has received a non-binding proposal from Timothy M. Marquez, Chairman and CEO of the company and the holder of approximately 50.3% of Venoco's outstanding common stock, to acquire all of the outstanding shares of Venoco common stock for $12.50 per share in cash. A copy of the text of the proposal letter to the Venoco board of directors is set forth below.
>
> In response, Venoco's board is in the process of forming a special committee of independent directors to consider the proposal, which will be comprised of all of the directors of the company other than Mr. Marquez. The committee will retain independent financial advisors and legal counsel to assist it in its work. The board of directors cautions Venoco shareholders and others considering trading in its securities that it has only received the proposal and that no decision has been made with respect to the company's response to the proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transactions will be approved or consummated.

31.     The press release included the proposal letter sent by Marquez, which stated:

> Directors:

I am pleased to offer to acquire all of the outstanding shares of the common stock of Venoco, Inc. (the "Company") at a cash purchase price of $12.50 per share. I believe that this offer is fair and in the best interest of the Company and its public shareholders and that the shareholders will find the proposal attractive. The offer represents a premium of 39% over the Company's most recent closing stock price on August 26, 2011 and a 27% premium to the average closing price in August 2011. Moreover, my proposal represents a total enterprise value to 2012 EBITDA multiple of 5.3x (using I/B/E/S consensus estimates) compared to the current median trading multiple of the Company's peer group of 3.9x 2012 EBITDA (using I/B/E/S consensus estimates).

The acquisition would be in the form of a merger of the Company with a new acquisition vehicle that I would form. I expect that the Company's senior management team would remain in place. I anticipate continuing to run the business in accordance with our current practice and maintaining the Company's valuable employee base, which I view as one of its most important assets.

I would expect to reinvest 100% of my equity ownership through this transaction. Although this offer is being made subject to obtaining financing on terms acceptable to me, I am confident that such financing can be obtained. I am preparing a draft merger agreement that I will provide to you shortly. The familiarity of the management team with the Company means that I will be in a position to complete limited, confirmatory due diligence and finalize the merger agreement very quickly.

I have retained Wachtell, Lipton, Rosen & Katz as my legal advisor. I expect that you will establish a special committee of independent directors with its own legal and financial advisors to review the proposal on behalf of the Company's public shareholders.

Of course, no binding obligation on the part of the Company or the undersigned shall arise with respect to the proposal or any transaction unless and until such time as definitive documentation satisfactory to me and recommended by the special committee and approved by the Board of Directors is executed and delivered.

I look forward to working with the special committee and its legal and financial advisors to complete a transaction that is attractive to

the Company's public shareholders. Should you have any questions, please contact me.

**The Board Agreed to Inadequate Consideration**

32.     The $12.50 consideration offered in the Buyout proposal is inadequate.

33.     The Buyout is an attempt by Marquez to purchase the Company at the most opportune time, at a time when the Company's stock price is trading at depressed levels and is positioned for significant growth.

34.     Just one week before Marquez made his proposal, the Company's stock traded at its 52 week low, trading at $8.18 per share on August 23, 2011. The Company's stock had closed as high as $22.22 per share as recent as February 2, 2011 and $14.75 per share on July 22, 2011.

35.     As can be seen in the below chart, the Company's stock has been trading well above the Buyout offer for much of the past year:



Marquez's offer is designed to capitalize on the recent drop in Venoco's stock price and is fundamentally unfair to the public shareholders of Venoco common stock.

36.     Numerous analysts believe that Marquez's $12.50 offer greatly undervalued Venoco, with one analyst calling Marquez's proposed acquisition the "Takeunder of the

Decade." An article on the streetinsider.com dated August 29, 2011 and titled "Analysts Say

CEO's Offer Greatly Undervalues Venoco (VQ), More Bids Will Come" described the view of

some analysts:

> Shares of Venoco (NYSE: VQ) have surged some 30 percent Monday morning following news the company's CEO issued a non-binding proposal at $12.50 per share in cash.
>
> While the Street certainly likes the offer, Wall Street analysts see bigger and better things for Venoco.
>
> Philip McPherson, an analyst at Global Hunter, calls the CEO bid the "Takeunder of the Decade."
>
> McPherson encourages investors not to sell into the news as another E&P company will most likely make another more appealing bid. Global Hunter currently has a $20 price target on shares of VQ.
>
> Prithcard Capital's Stephen Berman believes the $12.50 per share cash offer is also unlikely to occur as it undervalues the company significantly. Mr. Berman points out the bid does not factor in upside from Monterey Shale and the Hastings reversionary interest. The firm also believes another, much higher, offer will be via the CEO Mr. Marquez or another E&P.
>
> Susquehanna's Duane Grubert believes the offer may have been made in order to spark a competing bid. The analyst believes potential suitors could include Occidental (NYSE: OXY), Chevron (NYSE: CVX), Exxon (NYSE: XOM) and Chesapeake (NYSE: CHK).

37.    In an article on pacbiztimes.com dated September 2, 2011, analyst Phil

McPherson noted that Marquez's offer price fails to take into account the Company's greatest

growth potential, its Monterey shale operation in the Bay Area. As stated in the article:

> The company's greatest growth potential likes in a Monterey share operation in the Bay area, Phil Mcpherson, a Newport Beach-based analyst with Global Hunter Securities, told the Business Times. Marquez's offer doesn't appear to price that potential in, he said.

> "I think [Marquez] just grew tired of being a public-company
> CEO," Mcpherson said.

38.     As of August 11, 2011, Stifel Nicolaus had a $24.00 price target for Venoco

common stock. In July 2011, Pritchard Capital Partners set a price target of $19.00 per share for

Venoco common stock, and in May 2011, Barclays Capital reiterated a $20.00 price target for

Venoco.

39.     Accordingly, the $12.50 per share offer price by Marquez is inadequate. Indeed,

studies show that mergers where the purchasers are insiders of the target company provide

substantially less consideration to the target company's shareholders. An August 28, 2008 article

in the *New Yorker* highlights the inherent conflict that arises upon the sale of a publicly traded

company to insiders. As it noted:

> Since the beginning of 2005, nearly a hundred top-level executives
> at public companies have participated in management buyouts, or
> M.B.O.s, joining private- equity investors to buy their companies
> from shareholders.
>
> * * * * *
>
> The executives behind these buyouts say that they're the best
> solution for everyone involved. Investors get a nice bump in the
> price of their shares-H.C.A. shareholders, for instance, are getting
> twenty percent more than the market price- and executive are free
> from the demands of cautious investors and zealous regulators.
>
> * * * * *
>
> **What the executives in these deals don't say is that such buyouts
> create huge conflicts of interest.** The C.E.O. of a public company
> is legally obligated to look after shareholders' interests, which in
> the case of selling the company means getting the highest price
> possible. But when that same C.E.O. is trying to buy the company,
> he wants to pay the lowers price possible. Companies try to get
> around this by having independent members of the board of
> directors negotiate the deal. In practice, however, directors have
> generally been appointed by the company's C.E.O. and have spent
> a good deal of time working with him; they're hardly likely to
> drive a hard bargain. When the consortium led by Aramark's

C.E.O. first bid for the company, for instance, it offered thirty-two dollars a share. After shareholders complained, it upped the bid by $1.80, which directors accepted. Now, that's some real haggling. *A study of buyouts over the past two years suggests that when management is the buyer it pays, on average, thirty percent less than an outside bidder.*

Even more troubling, management buyouts give executives at public companies an incentive not to maximize the value of their companies before the sale. In 1987, for instance, after the textile giant Burlington Industries was taken private by a buyout group that included top Burlington executives, it quickly sold off the company's "nonproductive assets," including ten separate divisions and a host of manufacturing plants, for well over half a billion dollars. The executives could have done those deals while Burlington was a public company. But doing them after the buyout, when they owned more of the firm, meant that they reaped more of the benefits. Similarly, management buyouts are often associated with major restructurings to make companies leaner and more profitable. With few exceptions, these restructurings could be done before buyouts. But they're not, in part because executives would rather wait until they own a bigger chunk of the company. A study of buyouts in the U.K., for instance, found that C.E.O.s who planned to buy their own companies were less likely to embark on restructuring than C.E.O.s who weren't.

*Also, executives, before making a buyout offer, use accounting gimmicks to make their company's performance look worse than it really is*. In a study of more than sixty companies that went private, Sharon Katz, of the Harvard Business School, found that, in the two years preceding a management buyout, companies recorded lower than expected accounts receivable, which drove profits down. Similarly, a study by tow accounting professors found that executives pursuing M.B.O.s tended to accelerate the recognition of revenue, making their companies' performance. But these studies suggest that part of the reason is that executives were making them look bad while they were public.

* * * * *

But if management buyouts were really about the virtues of private ownership you'd expect companies that go private to stay private. The reality, though, is that, with high-profile deals, this rarely happens. Instead, after a company has been buffed and shines, it's generally taken public again. Both H.C.A. and Aramark, in fact,

> have gone from public to private to public, and now are private
> again. This suggests that management buyouts are often simply an
> opportunity for insiders to pick up assets on the cheap and flip
> them a few years later for fantastic sums. Over the past fifteen
> years, public companies have come up with ever more lavish
> performance-related pay packages, in the hopes of giving C.E.O.'s
> enough incentive to do their jobs and look after shareholders'
> interests. But why expect someone to be happy with tens of
> millions of dollars for putting shareholders first when he can get
> hundreds of millions for putting them last?

(emphasis added).

**The Process Was Inadequate and Skewed in Favor of the Company's Management**

40.   Further, as *The Wall Street Journal* reported on September 8, 2006, the process

through which a Company is sold to insiders is generally skewed in favor of the Company's

management. The Wall Street Journal article highlights this conflict as follows:

> In such cases [where a company is being sold to management],
> management, with all its detailed knowledge of the company, goes
> from being a seller striving for a high price to being a buyer
> looking for an attractive price. Usually the sale of a public
> company involves an auction or a competitive-bidding process.
> But when management [is involved], there often isn't such an open
> procedure, and the process is especially fraught with potential
> conflicts of interest.
>
> * * * * *
>
> While some boards are diligent in vetting deals, the process
> sometimes is skewed in favor of a sale. For example, there usually
> is a period when other bidders can come forth with offers. But if
> that window is short, the likelihood of a rival bid emerging isn't
> large, since potential buyers won't have time to perform due
> diligence. Special committees charged with weighing deals also
> can set breakup fees that make rival bidders pay dearly to get rid of
> the original buyer.

(emphasis added).

41.     The Buyout is designed to unlawfully divest Venoco's stockholders of a large portion of the valuable assets of the Company for inadequate consideration. Marquez knows that the Company possesses numerous assets that will continue to produce substantial revenue and earnings, which Marquez wishes to keep for himself. Through his greater than 50% ownership stake and through his role as CEO and Chairman of the Board, Marquez dominated and controls the Board and accordingly none of the directors of Venoco can be expected to protect the interests of the Company's public shareholders in a transaction which benefits Marquez at the expense of the shareholders. Although Venoco stated in the press release that it expects the Company will form a so-called "special committee" to evaluate the Buyout, the Buyout is essentially a *fait accompli* because the special committee is acting to appease Marquez, whom has no interest in a fair evaluation of the Buyout.

42.     The Buyout is wrongful, unfair and harmful to the Company's public shareholders, and represents an effort by defendants to aggrandize Marquez's financial position and interests at the expense of and to the detriment of Class members. The purpose of the Buyout is to enable Marquez to acquire 100% equity ownership of the Company and its valuable assets for their own benefit at the expense of the Company's public shareholders who will be deprived of their equity investment and the benefits thereof including, among other things, the expected growth in the Company.

43.     As a result of Defendants' conduct, Venoco's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which entitled in a sale of their Company.

**The Board Agreed to Anti-Competitive Deal Protection Measures**

44.     On top of failing to maximize shareholder value, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Buyout a *fait accompli* and ensure that no competing offers will emerge for the Company.

45.     Section 5.3 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Denver Parent Corporation. Section 5.3 also demands that the Company terminate any and all prior or on-going discussions with other potential acquirors.

46.     Pursuant to § 5.3 of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Denver Parent Corporation of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Denver Parent Corporation in order to enter into the competing proposal, it must grant Denver Parent Corporation three business days in which the Company must negotiate in good faith with Denver Parent Corporation (if Denver Parent Corporation so desires) and allow Denver Parent Corporation to amend the terms of the Merger Agreement to make a counter-offer that the Board must consider in determining whether the competing bid constitutes a superior offer. In other words, the Merger Agreement gives Denver Parent Corporation access to any rival bidder's information and allows Denver Parent Corporation a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse,

because the Merger Agreement unfairly assures that any "auction" will favor Denver Parent Corporation and piggy-back upon the due diligence of the foreclosed second bidder.

47.     The Merger Agreement also provides that a termination fee of up to $10 million must be paid to Denver Parent Corporation by the Company if it decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

48.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

49.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

50.     Plaintiff repeats all previous allegations as if set forth in full herein.

51.     As directors of Venoco, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.

52.     As demonstrated by the allegations above, the Individual Defendants are knowingly or recklessly failing to exercise the care required, and breaching their duties of loyalty, good faith, and independence owed to shareholders of Venoco because, among other reasons:

(a)     They are taking steps to avoid competitive bidding, to cap the price of Venoco common stock and to give Marquez an unfair advantage by, among other things, failing to adequately solicit other potential acquirers or alternative transactions;

(b)     They are ignoring or are not protecting against the numerous conflicts of interest resulting from the directors' own inter-relationships or connection with the Buyout; and

(c)     They have failed to engage in an honest and fair sales process.

53.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to members of the Class.

54.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Venoco's assets and will be prevented from benefiting from a value-maximizing transaction.

55.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Buyout, to the irreparable harm of the Class.

56.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duties
## (Against Marquez)

57.     Plaintiff repeats all previous allegations as if set forth in full herein.

58.     As the controlling shareholder of Venoco, Marquez owes a duty of undivided loyalty to Venoco public shareholders.

59.     The timing of the Buyout is a breach of Marquez's duty of good faith and loyalty and constitutes unfair dealing. The Buyout has been timed by Marquez to take advantage of Venoco's stock price which is temporarily depressed.

60.     The Buyout represents an opportunistic effort to free Marquez from dealings with Venoco's public shareholders at a substantial discount to the Company's actual value as well as the actual value of the Company's shares. The $12.50 offer does not represent fair value.

61.     Marquez is engaging in self-dealing and is not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly breached and is continuing to breach his fiduciary duties to members of the Class.

62.     As a result of Marquez's breaches of its fiduciary duties, Plaintiff and the Class will suffer irreparable injury.

63.     Unless enjoined by this Court, the Marquez will continue to breach his fiduciary duties owed to Plaintiff and the Class, and may consummate the Buyout, to the irreparable harm of the Class.

64.     Plaintiff and the Class have no adequate remedy at law.

**COUNT III**
**Aiding and Abetting**
**(Against Venoco)**

65.     Plaintiff repeats all previous allegations as if set forth in full herein.

66.     As alleged in more detail above, Venoco is well aware that the Individual

Defendants, including Marquez, have not sought, and are not seeking, to obtain the best available

transaction for the Company's public shareholders. Defendant Venoco aided and abetted the

Individual Defendants' breaches of fiduciary duties.

67.     As a result, Plaintiff and the Class members are being harmed.

68.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as

follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the

Class representatives and his counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Buyout;

(C)     enjoining defendants, their agents, counsel, employees and all person

acting in concert with them from consummating the Buyout unless and until the Company adopts

and implements a fair sales process;

(D)     in the event that the Buyout is consummated prior to the entry of this

Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the

Class for all damages caused by them and account for all profits and any special benefits

obtained as a result of their breaches of their fiduciary duties;

(F)      awarding Plaintiff the costs of this action, including a reasonable

allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)      granting Plaintiff and the other members of the Class such further relief as

the Court deems just and proper.

Dated:  January 26, 2012

/s/Charles W. Lilley_____
Charles W. Lilley #9443
Karen Cody-Hopkins #35367 (Of counsel)
CHARLES LILLEY & ASSOCIATES P.C.
730 17th Street, Suite 670
Denver, CO 80202
Telephone:  (303) 293-9800
Facsimile:  (303) 298-8975
Email: clilley@lilleylaw.com
Email: karen@codyhopkinslaw.com

Plaintiff's address:
John A. Maher
29910 Denton Street
Magnolia, TX 77354

OF COUNSEL:

LEVI & KORSINSKY LLP
Joseph Levi
W. Scott Holleman
30 Broad Street, 15th Floor
New York, NY10004
Tel: (212) 363-7500
Fax: (212) 363-7171